UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Audrey Heredia, as successor-in-interest to the Estate of Carlos Heredia; Amy Fearn as successor-in-interest to the Estate of Edith Zack; and Helen Ganz, by and through her Guardian ad Litem, Elise Ganz; on behalf of themselves and all others similarly situated,<br><br>           Plaintiffs,<br><br>   v.<br><br>Sunrise Senior Living, LLC; Sunrise Senior Living Management, Inc.; and Does 2 - 100,<br><br>           Defendants. | CASE NO. 8:18-cv-01974-JLS-JDE<br><br>**ORDER (1) GRANTING PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT (DOC. 631) AND (2) GRANTING PLAINTIFFS' MOTION FOR ATTORNEYS' FEES, COSTS, AND SERVICE AWARD (DOC. 632)** |

Before the Court are two unopposed Motions filed by Plaintiffs: one seeking final approval of the class action settlement and another seeking attorneys' fees, costs, and a class-representative service award. (Final Approval Mot., Doc. 631; Final Approval Mem., Doc. 631-1; Fees Mot., Doc. 632; Fees Mem., Doc. 632-1; Reply ISO Mot. for Final Approval and Fees ("Reply"), Doc. 635.) Having reviewed the papers and held a final fairness hearing on November 8, 2024, the Court (1) GRANTS the Motion for Final Approval of Class Action, and (2) GRANTS the Motion for Award of Attorney Fees, Costs, and Class-Representative Service Award.

## I.  BACKGROUND

The Court detailed the background facts of this action in its order conditionally granting preliminary approval of the class action settlement ("Prelim. Approval Order"). (*See* Prelim. Approval Order, Doc. 626.) In brief, Plaintiffs initiated this class action in Alameda County Superior Court on June 27, 2017. (*See* Compl., Doc. 1-1.) The Second Amended Complaint ("SAC") is brought on behalf of Named Plaintiffs Fearn and Ganz[1] against Defendants Sunrise Senior Living, LLC and Sunrise Senior Living Management, Inc. (collectively "Sunrise"). (SAC ¶¶ 10–13, Doc. 77.) The lawsuit arises from Sunrise's admissions contracts for its assisted living facilities in California; Plaintiffs allege that those contracts falsely represent the care services that residents will receive and conceal the fact that facility staffing is insufficient to address aggregate resident needs. (*Id.* ¶ 2.) Plaintiffs bring claims for elder financial abuse in violation of California's Welfare and Institutions Code, as well as violations of California's Consumers Legal Remedies Act ("CLRA") and Unfair Competition Law ("UCL"). (*See id.*) Sunrise removed the action to federal court on January 29, 2018, following late service of the Complaint. (*See* Notice of Removal ("NOR"), Doc. 1.) The action was then transferred to the Central District of California and this Court on October 31, 2018. (*See* Transfer Order, Doc. 42.) Both

---

[1] The SAC's Named Plaintiff was originally Helen Ganz; Elise Ganz substituted in as successor-in-interest following Helen's death. (*See* Order Granting Substitution, Doc. 620.)

before and after the transfer to this Court, this action was vigorously litigated—involving extensive discovery and motion practice, substantial case investigation efforts, and an appeal to the Ninth Circuit.

On April 17, 2024, Plaintiffs moved for preliminary approval of a settlement agreement.  (Mot. for Prelim. Approval, Doc. 614.)  After hearing oral argument and ordering supplemental briefing, the Court conditionally granted the motion by order dated July 26, 2024, pending Plaintiffs' submission of a revised notice packet.  (*See id.*)  There, the Court conditionally certified the following Rule 23(b)(3) class for settlement purposes:

> All persons who resided at a Sunrise California Facility from June 27, 2013, through the present ("Class Period"), contracted with and paid money to Defendants pursuant to a Residency Agreement, and whose claims are not subject to arbitration because: (1) neither the Resident nor Resident's Responsible Party (as defined in the Residency Agreement) agreed to or accepted the arbitration provision in writing; or (2) if arbitration was initially accepted, the Resident or Resident's Responsible Party provided written notice of  withdrawal within the 30-day period prescribed in the Residency Agreement.

(*Id.* at 7–8; *see also* Ex. 1 to Healey Decl. ISO Final Approval ("Settlement Agreement") ¶ 1.31, Doc. 631-3.)  The "Class Period" is from June 27, 2013 through and including three (3) business days prior to the Class Notice Date; provided that, the Class Period commences on the following dates for residents of these Communities: Sunrise of San Rafael (September 29, 2016), Sunrise of Cupertino (October 1, 2023), and Sunrise of Orange (April 27, 2023).  (Settlement Agreement ¶ 1.32.)  On August 2, 2024, Plaintiffs submitted their amended long and short forms of the settlement class action notice, which addressed the concerns the Court raised in its initial Order.  (*See* Status Report, Doc. 627.)  Accordingly, on August 7, 2024, the Court granted Plaintiffs Motion for Preliminary Approval of Class Settlement.  (Doc. 628.)

3

The Class Notice Date was August 27, 2024, (Garcia Decl. ISO Final Approval ("Garcia Decl.") ¶ 3, Doc. 631-19) and the opt-out/objection deadline was October 26, 2024. (*See* Doc. 628 at 3.)  Plaintiffs represent that this Class includes 4,183 individuals.  (Final Approval Mem. at 14.)

Under the Settlement, Sunrise agreed to provide both monetary and non-monetary relief to the Class Members.  As to monetary relief, Sunrise will provide a fund of $18.2 million ("Total Settlement Fund") to be distributed pro rata between the Class Members and resolve all claims that were alleged in this action.  (Settlement Agreement ¶ 7.6;  Final Approval Mem. at 15 n.2.)  From the Total Settlement Fund, the Settlement will distribute funds as follows:

- Settlement Administration costs in an amount not to exceed $75,000;
- Service awards for the Class Representatives of $15,000 each;
- An award of attorneys' fees in the amount of $10.5 million;
- An award of litigation costs not to exceed $1,699,627.86 million;
- A reserve fund of $25,000 to cover late claims;
- A settlement distribution to each Class Member from the Net Settlement Fund of $5.87 million equating approximately $1,403 per Class Member, which could increase upon a second distribution.

(Final Approval Mem. at 13–14; Settlement Agreement ¶¶ 1.16, 9.1, 9.4; Fees Mem. at 9, 16; Reply at 6.)  Settlement payments to Class Members will be distributed as follows:

- Each Class Member will receive a base payment of $500, with additional payment distributed based on the number of days that the Class Member resided in a Sunrise facility during the Class Period;
- Funds remaining from checks not cashed by a Member of the Settlement Class and any amounts not awarded by the Court for attorneys' fees, litigation costs, and class representatives' service awards will, if

economically feasible, be distributed pro rata to each Class Member who

cashed an initial settlement check in a second distribution;

- If a supplemental distribution of monies left in the reserve fund is not

    economically feasible as determined by the settlement administrator, and

    subject to Court approval, the remaining balance will be distributed through

    cy pres payment to Groceries for Seniors;[2]

- None of the fund will revert to Sunrise.

(*See* Ex. 2 to Healey Decl., Settlement Addendum ¶¶ 7.6.1, 7.6.2, 7.9, Doc. 631-5.)

In addition to the above monetary relief, Sunrise agreed to the following non-monetary

relief:

- An injunction[3] creating four sets of requirements for sixteen Sunrise

    facilities: disclosure requirements; staffing requirements; training

    requirements; and monitoring requirements.

(Ex. 1.1 to Healey Decl. ISO Final Approval, Stipulated Injunction ¶¶ 1–14, Doc.

631-4.)  The disclosure requirements prevent Sunrise staff from representing that

assessments of residential service needs are the only factor used to determine staffing

levels.  (*Id.* ¶ 1.)  The staffing requirements ensure that Sunrise will comply with state

regulations and allot staffing in proportion to the care tasks needed by residents.  (*Id.* ¶¶ 5–

6.)  The training requirements mandate annual training on responding to resident requests

for assistance, monitoring the provision of resident care, and staffing requirements.  (*Id.*

¶ 8.)  Finally, the monitoring requirements dictate that Sunrise will keep and maintain

records of every resident care request and response times and will provide regular reports

---

[2] This Court's Order conditionally granting preliminary approval of class action settlement
found that Groceries for Seniors is a proper cy pres recipient in the context of this action.  (*See*
Prelim. Approval Order at 5 n.2.)

[3] In its Preliminary Approval Order, the Court stated that the Settlement Agreement provides
for entry of a permanent injunction.  (Prelim. Approval Order at 5.)  That is incorrect.  The
Settlement Agreement provides that the stipulated Injunction will last 30 months.  (Settlement
Agreement ¶ 18.)

to Class Counsel.  (*Id.* ¶¶ 9–12.)  The Injunction shall remain in force and effect for a period of thirty (30) months commencing sixty (60) days from the date the Court grants final approval.  (*Id.* ¶ 18.)

In return for the relief described above, Plaintiffs and the Settlement Class Members who do not opt out of the Settlement will release all claims "arising out of or relating to the institution, prosecution, and resolution of the Action, through the date of the Final Approval Order."  (Settlement Agreement, ¶¶ 8.1–8.3.)  This release includes "any and all provisions, rights, and benefits of Section 1542 of the California Civil Code[.]"  (*Id.* ¶ 8.3.)

The Court's Class Certification Order found Named Plaintiffs Amy Fearn and Elise Ganz to be adequate Class Representatives, and appointed the law firms of Stebner & Associates, Schneider Wallace Cottrell Konecky LLP, Dentons US LLP, Law Offices of Michael D. Thamer, the Arns Law Firm, Janssen Malloy LLP, and Marks Balette Giessel & Young, P.L.L.C as Class Counsel.  (Certification Order at 32, 34, Doc. 504.)  The Court's Preliminary Approval Order approved CPT Group, Inc. ("CPT") as the Settlement Administrator.  (Prelim. Approval Order at 19–20.)

The Settlement Administrator, CPT Group, sent notice directly to Class Members via email and U.S. mail.  (*See generally* Garcia Decl.)  After receiving contact information for the Class Members from Sunrise, CPT conducted a national change of address search in order to update the class list of addresses.  (*Id.* ¶ 2.)  On August 27, 2024, CPT sent an initial set of 4,044 mail notices after confirming the mail addresses selected.  (*Id.* ¶ 4.)  Thereafter, on September 6, 2024, CPT sent an additional 139 Class Members mail notices.  (*Id.* ¶ 5.)  Between August 27, 2024 and September 6, 2024, CPT emailed the notice to 2,644 Class Members for whom CPT had confirmed email addresses.  (*Id.* ¶ 6.)  Thirty-one emails bounced back, and CPT sent notice by U.S. mail to these Class Members.  (*Id.*)  As of September 6, 2024, CPT has disseminated notices to 6,550 individuals who are Class Members or, where applicable, family members or

representatives of Class Members. (*Id.* ¶ 7.) After removing duplicate names, CPT understands that there are a total of 4,183 Class Members. (*Id.*)

Prior to August 27, 2024, CPT created a case-dedicated website, providing the Class Members with access to a copy of the Class Notice, case information, case dates, and copies of key documents filed in the action. (*Id.* ¶ 10.) CPT also created a toll-free telephone number for Class Members to call and speak to a live operator for up to 120 days following disbursement of the settlement, and established an email address to accept emails regarding the action. (*Id.* ¶¶ 11–12; *see also* Ex. C. to Garcia Decl. at 22, Doc. 631-22.) On September 9, 2024, CPT published the short form class notice in the California Weekday editions of USA Today. (Garcia Decl. ¶ 8.)

The deadline for any Class Member to object or opt-out has now passed. (Healey Decl. ISO Final Approval ¶ 137.) As of November 1, 2024, CPT had received two objections, and nineteen requests for exclusion, seven of which have been confirmed as valid. [4] (Garcia Decl. ¶¶ 16–17; Reply at 6.) The total charge for CPT's settlement administration services is $75,000. (Garcia Decl. ¶ 14; *see generally* Ex. C. to Garcia Decl.)

## II.    <u>CLASS CERTIFICATION</u>

In its Certification Order, the Court conditionally certified the Class under Rule 23(b)(3). (*See* Certification Order at 21–35.) In its Preliminary Approval Order, the Court amended its Certification Order to grant certification to the Class as defined in the Settlement Agreement. (*See* Prelim. Approval Order at 6–9.)

Nothing since the Preliminary Approval Order counsels the Court to depart from its previous conclusions on the existence of a proper Settlement Class. The Court therefore incorporates its class certification analysis from the Certification Order into the current Order. (Certification Order at 21–35.)

---

[4] At the final fairness hearing, Class Counsel stated that "valid" means that, in the case of a deceased Class Member, certain documentation is required to confirm that someone submitting a request for exclusion on the deceased's behalf has authority to do so.

### III.   FINAL APPROVAL OF THE CLASS ACTION SETTLEMENT

#### A. Legal Standard

Before approving a class-action settlement, the Court must determine whether the proposed settlement is fair, reasonable, and adequate. Fed. R. Civ. P. 23(e)(2). To do so, a district court must consider a number of factors, including: "[1] the strength of plaintiffs' case; [2] the risk, expense, complexity, and likely duration of further litigation; [3] the risk of maintaining class action status throughout the trial; [4] the amount offered in settlement; [5] the extent of discovery completed, and the stage of the proceedings; [6] the experience and views of counsel; [7] the presence of a governmental participant[5]; and [8] the reaction of the class members to the proposed settlement." *Staton v. Boeing Co.*, 327 F.3d 938, 959 (9th Cir. 2003) (cleaned up). "The relative degree of importance to be attached to any particular factor will depend upon and be dictated by the nature of the claim(s) advanced, the type(s) of relief sought, and the unique facts and circumstances presented by each individual case." *Officers for Just. v. Civ. Serv. Comm'n of City & Cnty. of S.F.*, 688 F.2d 615, 625 (9th Cir. 1982). "It is the settlement taken as a whole, rather than the individual component parts, that must be examined for overall fairness, and the settlement must stand or fall in its entirety." *Staton*, 327 F.3d at 960. These factors also overlap significantly with the factors codified in Rule 23(e), and so approval under the *Staton* factors is coextensive with approval under the Federal Rules.[6]

---

[5] This factor does not apply in this case.

[6] Rule 23 provides that a "court may approve" a class action settlement proposal "after considering whether: (A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3); and (D) the proposal treats class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2).

### B. Analysis

In its Preliminary Approval Order, the Court evaluated all but one of the factors
identified above to determine whether the Settlement Agreement is fair, reasonable, and
adequate under Rule 23. (*See* Prelim. Approval Order at 9–19.)  The Court determined
that the following factors weighed in favor of approval: (1) the strength of Plaintiffs' case;
(2) the risk, expense, complexity, and likely duration of further litigation; (3) the amount
offered in settlement; (4) the extent of discovery completed, and the stage of the
proceedings; and (5) the experience and views of counsel.  (*Id.*)  In so holding, the Court
noted that this is and has been a complex case requiring significant time and resources
from the parties.  The Court was also satisfied that there were no signs of collusion
between the parties.  (*Id.* at 18–19.)  The Court sees no reason to depart from its previous
conclusion as to these factors.  The Court therefore incorporates its analysis from the
Preliminary Approval Order into the instant Order.

At the time of preliminary approval, the Court did not evaluate Class Members'
reactions to the proposed Settlement Agreement.  In support of preliminary approval,
Plaintiffs submitted the declarations of the Class Representatives summarizing their views
of the settlement.  (*See* Fearn 4/17/24 Decl., Doc. 614-6; Ganz 4/17/24 Decl., 614-7.)
Class Counsel submitted supplemental declarations of the Class Representatives in further
support of their motions for final approval and attorneys' fees.  (*See* Ganz 10/29/24 Decl.,
Doc. 635-6; Fearn 10/29/24 Decl., Doc. 635-7.)  Plaintiffs also submitted an appendix of
updated Settlement Class Member declarations in support of their motion for final
approval.  (Appendix, Doc. 631-23.)  To date, CPT received nineteen requests for
exclusion, seven of which have been confirmed as valid, and two objections from the
4,183 Class Members.  (Garcia Decl. ¶¶ 16–17.)  The Court considers each of the
objections in turn.

First, on October 26, 2024, Ms. Lisa Gold, a family member of a Class Member,
postmarked an objection in which she (1) supported the monetary terms of settlement; (2)

raised questions as to terms of the Injunction; and (3) opposed the request for attorneys' fees.[7] (Gold Objection, Doc. 638.)  Ms. Gold also appeared at the final fairness hearing to provide further argument.  (Doc. 640.)  As to the Injunction, Ms. Gold questions the validity of Plaintiffs' estimated average Move-In Fee and is concerned that Sunrise facilities could "game" call light response times.  (Gold Objection at 2–3.)  Class Counsel responded to Ms. Gold's concerns both in Reply to its Motion and at the final fairness hearing.

Responding to Ms. Gold's concern as to the estimated average Move-In Fee ($1,518), Class Counsel provided that this sum is "based on Sunrise's estimate of the aggregate Move-In Fees paid, divided by the number of Settlement Class Members." (Reply at 9.)  This estimate is also consistent with Plaintiffs' damages expert's analysis of Sunrise's Move-In Fee billing data produced in discovery.  (*Id.* at 9; *see also* Kennedy Decl. ISO Class Cert. ¶ 93, Doc. 438-39.)  The Court finds that Plaintiffs' estimated average Move-In Fee is based on sufficient data and is thus satisfied with its validity.

As to Ms. Gold's concern with call light response monitoring, the Monitoring terms of the Injunction require Sunrise to produce call light response data that will enable Class Counsel to identify "a pattern of long-duration response times [which] would be red-flag indicator of potential understaffing" or, conversely, a "pattern of a large number of extremely short-duration response times [which] could indicate that call lights were being shut off without assistance first being provided."  (Reply at 7; *see also* Stipulated Injunction ¶¶ 9–12.)  Only four of the sixteen Sunrise injunction facilities have the technological capability to provide call light data in a database-ready format.  (Healey Decl. ISO Final Approval ¶ 60.)  For this reason, Ms. Gold expressed particular concern that the Injunction requires only more limited data production for the less technologically

---

[7] Ms. Gold filed an addendum to her objection on November 7, 2024, after the October 26, 2024 deadline for objections and requests for exclusion.  (Addendum, Doc. 641.)  As the Court explained to Ms. Gold at the final fairness hearing, the Court does not consider Ms. Gold's late-filed addendum.

capable Sunrise facilities (i.e., three 24-hour periods of data within the reporting quarter). (Gold Objection at 3.)  At the final fairness hearing, the Court asked Class Counsel to further describe what procedures they have in place to monitor call light response times at the twelve technologically limited Sunrise facilities.  Class Counsel informed the Court that attorney Kathryn Stebner, who negotiated the Injunction based on her decades of experience prosecuting elder abuse cases, as well as an associate working with Ms. Stebner, will be responsible for monitoring the call light data produced by all Sunrise facilities.  Class Counsel further informed the Court that, as to the technologically limited Sunrise facilities, "Class Counsel [will] select the facilities and days required for Sunrise's data production" and will provide notice only "at the end of the reporting period … so Sunrise has an incentive to ensure compliance."  (Healey Decl. ISO Final Approval ¶ 62; *see also* Stipulated Injunction ¶¶ 11–12.)  Having considered Ms. Gold's objection, Class Counsel's response, and the terms of the Injunction, the Court is satisfied that the Monitoring terms will allow Class Counsel to adequately monitor the duration of call light response times and thereby recognize red flags should there be any attempt by Sunrise to "game" call light responses.  For the above reasons, the Court OVERRULES Ms. Gold's objections as to the terms of the Injunction.

Second, both Ms. Gold and a second objector and family member of a Class Member, Mr. David Levy, object to Class Counsel's request for attorneys' fees and costs. (*See* Gold Objection at 3–7; Letter from David Levy ("Levy Objection"), Doc. 633.)  The Court first notes that neither objector considers the economic value to the Class of the Injunction, which the Court "must expressly consider" when awarding attorneys' fees. *Lowery v. Rhapsody Int'l, Inc.*, 75 F.4th 985, 992 (9th Cir. 2023).  (*See* Levy Objection; Gold Objection.)  When injunctive relief is properly considered, Class Counsel's fees represent 38% of the Settlement Fund; this falls within the "30% to 40% of the proceeds" Mr. Levy appears to find proper.  (*See* Levy Objection.)  Attorneys' fees in this range have also been approved in other class action settlements.  *See, e.g.*, *Cicero v. DirectTV, Inc.*,

2010 WL 2991486, at *6–7 (C.D. Cal. July 27, 2010). And neither objector separates litigation costs and requested fees when making their arguments that Plaintiffs' request represents an improper percentage of the settlement fund. (*See* Levy Objection; Gold Objection.) While Ms. Gold's more specific concerns as to Plaintiffs' lodestar are well-taken—namely, that Class Counsel's Cost Summary includes what Ms. Gold finds to be inaccuracies, may double count reimbursements to the Marks Balette firm, and references other comparable class action cases—none ultimately counsel against a finding that the settlement is fair, reasonable, and adequate. First, any discrepancies in billing are sufficiently accounted for in Class Counsel's fee request of $10.5 million, which reflects a .77 negative multiplier applied to Class Counsel's lodestar of $13.6 million (reduced from $15 million after billing judgment and other adjustments). (Healey Decl. ISO Final Approval ¶¶ 106–124.) Next, following the final fairness hearing, Class Counsel submitted declarations clarifying that "[t]he expert/consultant payments made by Marks Balette (for which that firm were reimbursed by other Class Counsel) were ***not*** included in the Marks Balette's tab on the Cost Summary," (Healey Decl. ISO Mot. ¶ 4, Doc. 639), and that "the expert expenses in the Marks Balette section of the Cost Summary are limited to . . . data analysis services provided by Superior Analytics/Blake Peters . . . and the ProModel software charge." (Healey Suppl. Decl. ISO Mot. ¶ 9, Doc. 642.) Moreover, Class Counsel clarified that the Cost Summary includes references to three other assisted living class actions because "25% of the initial ProModel expense [a computational software simulation program used to analyze healthcare understaffing that Plaintiffs adapted to the assisted living context] was allocated equally" between Sunrise and the other three cases. (*Id.* ¶ 6; *see also* Declaration of David T. Marks ¶¶ 6–7, Doc. 631-11 (describing ProModel).) For these reasons, the Court finds that neither Ms. Gold's nor Mr. Levy's objection warrant denial of Plaintiffs' application for attorneys' fees or costs. The objections are thus OVERRULED. Considering the small number of objections and the nineteen requests for exclusion—which, while not insignificant are not wholly

unexpected for an action of this nature—the Court finds that this factor weighs in favor of approval.  *See Sebastian v. Sprint/United Mgmt. Co.*, 2019 WL 13037010, at \*5 (C.D. Cal. Dec. 5, 2019) (Staton, J.) (finding that a low number of objections "raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members." (quoting *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1043 (N.D. Cal. 2008))); *see also Maine State Ret. Sys. v. Countrywide Fin. Corp.*, 2013 WL 6577020, at \*16 (C.D. Cal. Dec. 5, 2013) (finding that 69 exclusion requests in response to mailing of over 50,000 notices supported settlement).

Under Rule 23(e), the Court is satisfied that the Class Representatives and Class Counsel have adequately represented the Class, that the proposal was negotiated at arm's length, that the relief provided is adequate, and Class Members are treated equitably relative to each other.  Similarly, having weighed the *Staton* factors and considered the Settlement as a whole, the Court finds that the proposed settlement is fair, reasonable, and adequate.

## IV.   ADMINISTRATION COSTS

As noted above, Plaintiffs' Motion for Final Approval requests an award of administration costs to the Settlement Administrator, CPT, of $75,000.00.  (Final Approval Mem. at 14; *see also* Ex. C to Garcia Decl.)  This amount is $6,000.00 higher than the $69,000.00 administration costs award approved by the Court in its Preliminary Approval Order.  (*See* Final Approval Mem. at 16 n.2; Prelim. Approval Order at 19–20.)

Plaintiffs have submitted a declaration from Irvin Garcia, Case Manager II at CPT, that explains the steps CPT took to determine adequate contact information for Class Members and actually contacting the Class Members, which included contacting 6,550 individuals who are Class Members or family members or representatives of Class Members.  (Garcia Decl. ¶ 7.)  Where relevant, CPT contacted multiple family members of residents.  (*Id.*)  Having reviewed the updated CPT bid and Garcia declaration, the Court finds that Plaintiffs' request of an increase in the award here is reasonable.

Accordingly, the Court GRANTS the Motion for Final Approval of Class Action Settlement as to this payment.

## V. <u>LITIGATION COSTS</u>

Plaintiffs ask the Court to approve reimbursement from the Gross Settlement amount for litigation costs and expenses in the amount of $1,699,627.86. (Reply at 6.) The requested amount reflects a courtesy reduction for certain cost items totaling $9,568.68. (*Id.*) "Attorneys may recover their reasonable expenses that would typically be billed to paying clients in non-contingency matters." *Sebastian*, 2019 WL 13037010, at *9 (quoting *In re Omnivision*, 559 F. Supp. 2d at 1048). Class Counsel have documented filing and service fees, Westlaw/Lexis charges, research and travel costs, costs for depositions and transcripts, and expert witness and consultant fees that they have incurred in litigating this matter. (*See* Reply at 5–6; Ex. 2 to Healy Decl. ISO Reply, Doc. 635-3.) The Court inquired into Class Counsel's Westlaw/Lexis charges at the final fairness hearing—specifically as to whether they reflect actual charges incurred by Class Counsel or if Class Counsel instead operates under a flat fee agreement with Westlaw and/or Lexis. In response, Class Counsel represented that the Westlaw/Lexis charges "reflect the charges . . . incurred for the Westlaw/Lexis searches, with no markup." (Healey Decl. ISO Mot. ¶ 3.) The Court also raised concern as to a $3,912.21 conference room fee included in the Cost Summary. Following the hearing, Class Counsel indicated that they had applied a courtesy reduction to certain cost items totaling $9,568.68 from their reimbursement request, including a reduction on the conference room cost from the $3,912.21 to $500. (*Id.* ¶¶ 8–10; *see also* Exs. 2 & 3 to Reply ISO Mot. for Final Approval, Docs. 635-3. 635-4.) The Court finds the various expenses adequately documented and reasonable.

## VI. <u>ATTORNEY FEES</u>

Rule 23 permits a court to award "reasonable attorney's fees . . . that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). "[C]ourts have an independent obligation to ensure that the award, like the settlement itself, is reasonable,

even if the parties have already agreed to an amount." *In re Bluetooth*, 654 F.3d at 941.  In the Ninth Circuit, the benchmark for a reasonable fee award in common-fund cases is 25% of the recovery obtained.  *See id.* at 942.  Courts must "justify any increase or decrease from this amount based on circumstances in the record."  *Monterrubio v. Best Buy Stores, L.P.*, 291 F.R.D. 443, 455 (E.D. Cal. 2013) (citing *Six (6) Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990)).

The Ninth Circuit has identified a number of factors the Court may consider in assessing whether an award is reasonable, including: (1) the results achieved, (2) the risk of litigation, (3) the skill required and quality of work, and (4) the contingent nature of the fee and the financial burden carried by the plaintiffs.  *See Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048–50 (9th Cir. 2002).  Counsel's lodestar may also "provide a useful perspective on the reasonableness of a given percentage award."  *Id.* at 1050.  "The benchmark percentage should be adjusted, or replaced by a lodestar calculation, when special circumstances indicate that the percentage recovery would be either too small or too large in light of the hours devoted to the case or other relevant factors."  *Six (6) Mexican Workers*, 904 F.2d at 1311.

Here, Class Counsel seek fees in the amount of roughly 38% of the $27.56 million overall value to Class Members, or $10.5 million.  (Fees Mem. at 1, 22; Reply at 12.)  Plaintiffs argue that the requested fee is reasonable under a lodestar analysis.  (Fees Mem. at 19–31.)  For the following reasons, the Court finds the requested award reasonable and GRANTS Plaintiffs' request.

### A. Results Achieved

The Settlement Agreement provides for an all-in settlement fund of $18.2 million, as well as a stipulated Court-ordered injunction.  (Settlement Agreement ¶¶ 7.1, 7.2.)  In this, Class Counsel achieved a settlement that represents about 21.14% of Plaintiffs' maximum possible trial classwide recovery ranges and 51.87% of Plaintiffs' estimated

reasonably achievable trial recovery.[8]  (*See* Healey Decl. ISO Final Approval ¶¶ 82, 83; Prelim. Approval Order at 15.)  Given the complexities inherent in litigating this action, including the uncertainties as to how a jury would decide to calculate classwide damages at trial, such recovery represents a superior result, and is within the range of class action settlements approved by District courts in the Ninth Circuit.  *Hurtado v. Rainbow Disposal Co., Inc.*, 2021 WL 2327858, at *4 (C.D. Cal. May 21, 2021) (approving class settlement that offered approximately 23.4–34% of the maximum amount recoverable at trial); *Winans v. Emeritus Corp.*, 2016 WL 107574, at *5 (N.D. Cal. Jan. 11, 2016) (approving class settlement that offered about 33.2% of "maximum projected 'hard damages' at trial").  While the recovery percentage falls within a generally approved range, the monetary amount figure offered per Class Member—here $1,403, if divided evenly[9]—is larger than other, comparable settlements involving assisted living facilities, which procured amounts less than $1,000 per Class Member.  (Healey Decl. ISO Final Approval ¶¶ 90–92; Ex. 3 to Healey Decl. ISO Final Approval, Doc. 631-6.)

Moreover, the injunction terms provide substantial non-monetary benefits to the Class.  Under the Settlement Agreement, Sunrise must abide by four sets of requirements: disclosure requirements; staffing requirements; training requirements; and monitoring requirements.  (Stipulated Injunction ¶¶ 1–14.)  In support of the Motion for Final Approval, Class Counsel provided an updated analysis from damages expert Dr. Patrick Kennedy estimating that the economic value of the Injunction requirements to Settlement Class Members currently residing in Sunrise injunction facilities is at least $9.36 million.

---

[8] Consistent with its Preliminary Approval Order, the Court sets the overall settlement value using the Injunction's value to Class Members, not the general public.  (*See* Prelim. Approval Order at 14.)

[9] Of course, per-Class Member allotment will vary, pursuant to the distribution formula, with every Class Member to receive a base fee of $500 plus an additional payment based on the resident's duration of stay at a Sunrise facility.  (Healey Decl. ISO Final Approval ¶ 55.) Additionally, under the settlement, none of the settlement fund will revert to Sunrise; instead, any money left in the fund after initial distribution will be sent to Class Members who cashed their checks or will be made as a cy pres payment to Groceries for Seniors.  (Settlement Agreement ¶ 7.9; Healey Decl. ISO Final Approval. ¶ 95.)

(*See* Healey Decl. ISO Final Approval ¶ 97; Kennedy Supp. Decl. ¶ 6, Doc. 631-18.)  Dr.
Kennedy evaluates the economic harm avoided by Class Members as a result of the
Injunction.  (Kennedy Supp. Decl. ¶ 3.)  While Dr. Kennedy's prior valuation used an
estimate that 20% of the total current residents in Sunrise injunction facilities were Class
Members, the updated valuation uses information from Sunrise showing that 42.1% of the
total residents in Sunrise injunction facilities are Class Members.  (Healey Decl. ISO Final
Approval ¶¶ 97–100; *see generally* Kennedy Supp. Decl. ISO Final Approval.)
Dr. Kennedy's valuation supports a finding that the non-monetary terms of the Injunction
offer substantial benefit to the Class.

  Furthermore, requiring, and providing for monitoring to confirm, that Sunrise
facility staffing is sufficient to meet resident needs will materially increase the likelihood
that Sunrise's future staffing policies ensure staffing is sufficient to timely provide
promised care services to residents.  Such expansive, robust relief would have been less
likely achieved at trial, with Defendants likely to oppose Staffing and Monitoring
Requirements on grounds of equitable abstention.  (Healey Decl. ISO Final Approval ¶
63.)  The outstanding programmatic relief obtained here, combined with comparatively
significant and fair monetary recovery, weighs in favor of an upward departure from the
benchmark in awarding attorneys' fees.

### B. Risk of Litigation

  The Court found that the risks of ongoing litigation in this case were significant in
its Preliminary Approval Order: Plaintiffs' ability to maintain class certification is far from
certain as Sunrise has asserted it would seek to decertify the class and continues to dispute
whether common questions predominate and whether further discovery would warrant
decertifying the class, and any future recovery would require Plaintiffs to depose
additional lay and expert witnesses, survive summary judgment, prevail at a weeks-long
trial, and withstand any subsequent appeals.  (Prelim. Approval Order at 11; Healey Decl.
ISO Final Approval ¶¶ 74–80.)  Further, as noted above, proving damages could be

especially challenging, particularly as they rely in part on a jury's willingness to award trebling of CLRA statutory damages. (*See* Healey Decl. ISO Final Approval ¶¶ 70–73.) Given the significant risks posed by ongoing litigation here, the Court finds that this factor also weighs in favor of an upward departure from the 25% benchmark.

### C. Skills Required and Quality of Work

Class Counsel are experienced class action attorneys who provided high-quality, skillful work throughout this complex litigation. Class Counsel have been recognized for their work prosecuting and defending large class actions and includes attorneys nationally recognized as specialists in elder abuse and understaffing litigation. (Healey Decl. ISO Final Approval ¶¶ 10–30.) Indeed, the Court recognizes the specialized expertise this litigation required as Class Counsel navigated multiple rounds of briefing on class certification and *Daubert* motions (including a Ninth Circuit appeal necessitating the involvement of preeminent appellate attorneys), extensive trial preparation, the negotiation of a comprehensive settlement agreement through multiple sessions of mediation, and supplemental briefing at the Preliminary Approval stage. (Fees Mem. at 4–8; Healey Decl. ISO Final Approval ¶¶ 31–47.) And the total lodestar amount as of the filing of the present motion, which is discussed in greater detail below, supports Class Counsel's account of hard work on the matter. *Cf. Sebastian*, 2019 WL 13037010, at *7. Further, as discussed in Section III.B, *supra*, the Court is not persuaded by Ms. Gold's or Mr. Levy's objection to attorneys' fees. (Gold Objection at 3–7; Levy Objection.) While Ms. Gold objects on the grounds that the Cost Summary contains what she perceives to be discrepancies—specifically, instances where various counsel billed different amounts of time for the same conference and instances where Ms. Gold believes Class Counsel double billed for a task—Class Counsel has sufficiently accounted for any such discrepancies in its fee request of $10.5 million based on a reduced lodestar amount of $13.6 million. (*See* Gold Objection at 3–7; Healey Decl. ISO Final Approval ¶¶ 106–124; Ex. 2 to Healey Decl. ISO Reply.) And Ms. Gold's objection that the percentage of attorneys' fees sought

18

by Class Counsel exceeds that awarded in comparable settlements is unavailing for the reasons discussed herein. Likewise, as previously noted, Class Counsel's fee request falls within the "30% to 40% of the proceeds" Mr. Levy appears to find proper. (*See* Levy Objection.)

The settlement achieved is the result of years of protracted discovery, complex litigation, and hard-fought negotiations by Class Counsel. In light of the above, the Court finds that this factor also weighs in favor of an upward departure from the benchmark amount.

### D. Contingent Nature of the Fee

Class counsel spent more than 20,000 hours litigating this case for over seven years. (Fees Mem. at 10; *see generally* Ex. 4 to Healey Decl. ISO Final Approval ("Lodestar Summary"), Doc. 631-7; Ex. 1 to Healey Decl. ISO Reply ("Updated Lodestar Summary"), Doc. 635-2.) Class Counsel received no payment for their services during the litigation and paid for all litigation costs, including significant expert discovery costs in support of the class certification and *Daubert* motions. (Fees Mem. at 10, 33–34; *see generally* Lodestar Summary; *see also* Reply at 10–11.) "Courts have long recognized that the attorneys' contingent risk is an important factor in determining the fee award and may justify awarding a premium over an attorney's normal hourly rates." *Monterrubio*, 291 F.R.D. at 457 (citing *In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1299 (9th Cir. 1994)). Given the complexity and length of this litigation, as well as the number of hours Class Counsel committed to its prosecution, the Court finds that this factor also weighs in favor of granting the requested fee award.

### E. Lodestar Cross-Check

"Calculation of the lodestar, which measures the lawyers' investment of time in the litigation, provides a check on the reasonableness of the percentage award." *Vizcaino*, 290 F.3d at 1050.

Here, 27 attorneys from eight law firms have worked on this matter for a total of 20,903.4[10] hours through September 24, 2024. (*See* Lodestar Summary; Updated Lodestar Summary.)  Attorneys from all eight firms have submitted declarations that set forth the experience of, hours billed, hourly rate, and total estimated fees for each of those 27 attorneys. (*See generally* Healey Decl. ISO Final Approval; Marks Decl. ISO Final Approval, Doc. 631-11; Thamer Decl. ISO Final Approval, Doc. 631-12; Stebner Decl. ISO Final Approval, Doc. 621-13; Yarnall Decl. ISO Final Approval, Doc. 631-14; Wallace Decl. ISO Final Approval, Doc. 631-15; Olivier Decl. ISO Final Approval, Doc. 631-16; Warren Decl. ISO Final Approval, Doc. 631-17.)

The lodestar crosscheck first requires the Court to determine whether the hourly rates sought by counsel are reasonable.  "[T]he district court must determine a reasonable hourly rate considering the experience, skill, and reputation of the attorney requesting fees." *Chalmers v. City of Los Angeles*, 796 F.2d 1205, 1210 (9th Cir. 1986).  This determination "is not made by reference to rates actually charged [by] the prevailing party." *Id.*  The fee applicant bears the burden of showing that "the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 980 (9th Cir. 2008) (cleaned up).  "Affidavits of the plaintiffs' attorney and other attorneys regarding prevailing fees in the community, and rate determinations in other cases, particularly those setting a rate for the plaintiffs' attorney, are satisfactory evidence of the prevailing market rate." *United Steelworkers of Am. v. Phelps Dodge Corp.*, 896 F.2d 403, 407 (9th Cir. 1990).  Courts may also "rely on [their] own familiarity with the legal market." *Ingram v. Oroudjian*, 647 F.3d 925, 928 (9th Cir. 2011).  As a general rule, the forum district represents the relevant legal community.  *See Gates v. Deukmejian*, 987 F.2d 1392, 1405 (9th Cir. 1992).

---

[10] The Motion for Attorneys' Fees states that Class Counsel has worked over 21,100 hours. (Fees Mem. at 22.)  In light of the differing hours presented, the Court proceeds according to the hours listed in the lodestar summary.

In light of its familiarity with the legal market, the unique challenges posed by this matter, Class Counsel's experience, and the skill and commitment with which they prosecuted the matter, the Court finds that the rates above are reasonable.

Next, the Court finds that the detailed billing records Class Counsel attached to their motion offers a satisfactory accounting of the attorney work hours on this case. (*See* Updated Lodestar Summary.)   A review of the records shows that administrative tasks were appropriately delegated to legal support staff and billed at a lower rate.  Furthermore, the presence of partners and associates with experience ranging from over 40 years to only two years in practice is of special importance to the Court, as it demonstrates a tendency toward efficient billing.  That said, the record also seems to show that discovery-related tasks and initial motion drafting were at times frequently handled by attorneys with higher billing rates.  Still, on balance, the Court is satisfied that the requested fees are not a "windfall" for Class Counsel.  *In re Bluetooth*, 654 F.3d 935, 942 (9th Cir. 2011).  Class Counsel's collective reduction in the lodestar fees total over $1 million and the fee ultimately requested—$10.5 million—is significantly lower than Class Counsel's net lodestar—well over $14 million.  Indeed, even if the Court were to shave an additional ten percent from the lodestar amount based on some level of inefficiency or block-billing, the resulting lodestar would still exceed the requested fees.

Taking into account the *Vizcaino* factors and lodestar crosscheck, the Court GRANTS Plaintiffs' request for attorneys' fees.

## VII.    CLASS-REPRESENTATIVE SERVICE AWARD

The Settlement provides for a service award of $15,000 each to Fearn and Ganz for bringing this action as Class Representatives.  (Settlement Agreement ¶ 9.4.)

Service awards are "discretionary . . . and are intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general."  *Rodriguez v. W. Publ'g Corp.*, 563 F.3d

948, 958–59 (9th Cir. 2009) (citing *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 463 (9th Cir. 2000)).  "To assess whether an incentive payment is excessive, district courts balance 'the number of named plaintiffs receiving incentive payments, the proportion of the payments relative to the settlement amount, and the size of each payment.'" *Monterrubio*, 291 F.R.D. at 462 (quoting *Staton*, 327 F.3d at 977).  Courts "must 'evaluate [such] awards individually' to detect 'excessive payments to named class members' that may indicate 'the agreement was reached through fraud or collusion.'" *Monterrubio*, 291 F.R.D. at 462 (quoting *Staton*, 327 F.3d at 975, 977).

Class Counsel argues the service awards are warranted because both Fearn and Ganz "devoted considerable time and effort throughout their extended service (close to five years) in this litigation."  (Fees Mem. at 32.)  Fearn and Ganz participated in numerous conferences with Class Counsel, submitted declarations in support of various motions, responded to written discovery, sat through full-day depositions requiring them to "revisit painful and difficult experiences by beloved family members", were on call for mediation sessions, and both turned down individual settlement offers for $11,424.00 and $50,000.00, respectively.  (*Id.*; *see also* Fearn 4/17/24 Decl. ¶¶ 30, 32–34; Ganz 4/17/24 Decl. ¶¶ 34–40.)  Both Fearn and Ganz estimate having spent at least 75 hours on the case, (Fearn 4/17/24 Decl. ¶ 29; Ganz 4/17/24 Decl. ¶ 33), and the Court has no reason to doubt that their efforts in this litigation were substantial.

Fearn's and Ganz's contributions have undoubtedly helped bring about monetary relief for the entire class and the non-monetary changes at Sunrise pursuant to the stipulated Injunction.  The requested amount represents 0.1% of the Settlement Fund and will be distributed to two Class Representatives who have given a significant amount of time—as well as emotional and mental energy—to the litigation.  Both Class Representatives also turned down individual settlement offers near to or far exceeding the requested amount.  (Fearn 4/17/24 Decl. ¶ 34; Ganz 4/17/24 Decl. ¶ 40.)  Accordingly, the

Court finds that a service award in the amount requested is appropriate and AWARDS Fearn and Ganz $15,000 each.

### VIII.  POST-DISTRIBUTION STATUS REPORT

Class Counsel shall file a post-distribution status report within twenty-one (21) days after the substantial completion of distribution of the settlement to Class Members, and payment of attorneys' fees and costs, and service awards to class-representatives.  The status report shall include information on when distributions were made to Class Members, the number of Class Members who were sent payments, the total funds distributed, and the average and median distribution to Class Members, the largest and smallest distribution to Class Members, the number and value of cashed and uncashed checks, the number and value of attempted distributions to Class Members, general information about efforts made to contact Class Members regarding attempted distributions, any significant or recurring concerns communicated by Class Members since final approval, the administrative costs, and any other material facts about settlement distribution.  The status report shall also describe all monitoring work performed by Class Counsel in connection with the Injunction, along with the results of that monitoring.  With the status report, Class Counsel shall submit a request for any remaining balance in the settlement fund to be distributed through cy pres payment to Groceries for Seniors.

### IX.  CONCLUSION

The Court finds the settlement to be fair, adequate, and reasonable.  Accordingly, the Court GRANTS the Motion for Final Approval of Class Action Settlement.  The Court thus awards settlement administration costs in an amount not to exceed $75,000.

The Court also GRANTS the Motion for Award of Attorneys' Fees, Costs, and Service Payment as follows:

- Service awards for the Class Representatives of $15,000 each, totaling $30,000;
- An award of attorneys' fees in the amount of $10.5 million; and

- An award of litigation costs in the amount of $1,699,627.86.

Distribution of settlement payments to Class Members shall be made in accordance with the method outlined in the Settlement Agreement.

Class Counsel is ORDERED to file a proposed final judgment within five (5) days of entry of this Order.

DATED:  December 03, 2024

_____

HON. JOSEPHINE L. STATON
UNITED STATES DISTRICT JUDGE